**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
─────────────────────────────────────────

**JASIB HEADLEY,**

<b>Petitioner,</b>

<b>v.</b>                                              **9:07-CV-979**
                                                                              **(FJS/GHL)**
**ROBERT ERCOLE,**

<b>Respondent.</b>
─────────────────────────────────────────

**APPEARANCES**                              **OF COUNSEL**

**OFFICE OF RUTH M. LIEBESMAN**             **RUTH M. LIEBESMAN, ESQ.**
460 Myrtle Avenue
Fort Lee, New Jersey 07024
Attorney for Petitioner

**OFFICE OF THE NEW YORK**                  **LEA L. LA FERLITA, AAG**
**STATE ATTORNEY GENERAL**                  **JODI A. DANZIG, AAG**
120 Broadway
New York, New York 10271
Attorneys for Respondent

**SCULLIN, Senior Judge**

<b>MEMORANDUM-DECISION AND ORDER</b>

<b>I. BACKGROUND</b>

**A.       Proceedings in state court**

On March 28, 2003, Petitioner Jasib Headley and a person identified as "Puda"

mistakenly shot Ronnie Davis ("the victim") with a 9 mm handgun and a .32 caliber handgun

after the victim exited the Vinny Mart, a convenience store, on Chenango Street in Binghamton,

New York.  *See* TT[1] at 319-20, 417-19.  They believed that the victim was an individual named Ratike, whom Devaughn Ballard had told them to kill.  *See id.* at 415-19.  Petitioner shot the victim five times.  *See id.* at 319-20, 419.  Petitioner and Puda ran away.  *See id.* at 319, 419.

Police responded to the scene.  *See id.* at 258-59.  The victim was transported to a hospital where he died as a result of the gunshot wounds.  *See id.* at 221-27.  Petitioner later confessed to the shooting when speaking with Binghamton Police Investigator Brett Surace.  *See id.* at 415-16.

Petitioner was charged with committing two counts of murder in the second degree ("intentional murder" and "depraved indifference murder").  *See* Dkt. No. 42-16 at 5-9.  He was also charged with committing conspiracy in the second degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree.  *See id.*

At trial, Matthew Young, who testified pursuant to an agreement with the District Attorney's Office, stated that, two weeks before the shooting, he heard Petitioner, Ballard, and Puda discussing plans to kill Ratike whom Ballard claimed had been disrespectful to him.  *See* TT at 300-10.  On the night of the shooting, Young drove Petitioner and Puda to the vicinity of the convenience store and parked the vehicle.  *See id.* at 313-14.  Petitioner and Puda exited the vehicle.  *See id.* at 318.  Shortly thereafter, Young heard gunshots.  *See id.* at 318-19.  Petitioner and Puda returned to Young's vehicle and told Young to drive.  *See id.* at 319-20.  While he was driving, Young heard Petitioner say that he thought he "hit somebody" and that he heard someone say, "Ow."  *See id.*  Young drove the vehicle to his niece's house where Petitioner and Puda hid

---

[1] "TT" refers to the page numbers pre-printed in the upper right-hand corner of the trial transcript filed at Dkt. Nos. 42-17, 42-18, 42-19.  References to other state-court records are to the location of the records on the Court's electronic filing system.

the guns.  *See id.* at 321, 323-25.  Ballard then arrived and informed them that the wrong man was shot.  *See id.* at 323-24.

Lisa Mack, who received favorable treatment from the District Attorney's Office, also testified at trial.  *See* TT at 384-85.  She testified that she saw Young, Puda, Ballard, and Petitioner together in Ballard's apartment a few hours before the shooting.  *See id.* at 377.

Investigator Brett Surace also testified at trial.  *See id.* at 405-34.  He explained that Petitioner was arrested in Brooklyn.  *See id.* at 408.  Petitioner was taken to the local precinct where several officers questioned him.  *See id.* at 409.  Initially, Petitioner denied being involved in the shooting.  *See id.* at 414-15.  However, once Investigator Surace was alone with Petitioner, Petitioner admitted that Ballard sent him after Ratike and that he fired the .32 caliber handgun.  *See id.* at 415-19.  Investigator Surace then left the office in order to obtain "some writing materials so [he] could take a written statement from [Petitioner]."  *See id.* at 422.  However, when he returned to the office, Petitioner asked for an attorney.  *See id.* at 431-32.  Investigator Surace also stated that the oral confession was not taped because the interview took place in an office that had no recording equipment due to crowding at the precinct.  *See id.* at 408-10, 428.

Petitioner was convicted of the first count of murder in the second degree ("intentional murder"), conspiracy, and the two counts of criminal possession of a weapon in the third degree.  *See id.* at 564-65.  Petitioner was sentenced to serve a prison term of thirty-three years-to-life.  *See id.*

The Appellate Division, Third Department affirmed Petitioner's conviction, and the Court of Appeals denied Petitioner leave to appeal.  *See People v. Headley*, 38 A.D.3d 1007 (3d Dep't), *leave denied,* 9 N.Y.3d 865 (2007).

**B.      The present action**

On September 6, 2007, Petitioner commenced the present action, *pro se*, seeking a writ of

habeas corpus.  *See* Dkt. No. 1.  However, before Respondent filed a response to the petition,

Petitioner, on March 6, 2008, filed a motion to stay his petition in order to permit him to exhaust

a claim that trial counsel was ineffective.  *See* Dkt. No. 9.  The Court granted Petitioner's motion.

*See* Dkt. No. 13.

On March 2, 2009, Petitioner filed a letter-motion in which he asked that the Court lift

the stay.  *See* Dkt. No. 20.  Petitioner stated that, on December 8, 2008, the Broome County

Court denied his motion pursuant to New York's Criminal Procedure Law § 440.10 ("§ 440

motion"), which he had filed on May 14, 2008, and that the Appellate Division, Third

Department, denied leave to appeal on February 11, 2009.  *See id.*  Petitioner requested an

additional ninety days to file an amended petition to include the newly exhausted claims and to

"amplify the claims currently before the court."  *See id.*

In an Order dated March 16, 2009, the Court lifted the stay and directed Petitioner to file

an amended petition within sixty days of the date of the Order.  *See* Dkt. No. 21.

On May 15, 2009, Petitioner filed an amended petition along with several state-court

records.  *See* Dkt. No. 22.  However, after a review of the amended petition, it was unclear

whether Petitioner intended to abandon two particular claims in his original petition or whether

his amended petition was intended to supplement the original petition.  *See* Dkt. No. 23.

Therefore, the Court provided Petitioner with an opportunity to file a second amended petition.

*See* Dkt. Nos. 23, 25.

On July 22, 2009, Petitioner filed a second amended petition in which he raised the

following grounds for habeas relief: (1) trial counsel was ineffective for failing to investigate and present a viable alibi defense, conduct an adequate pretrial investigation, impeach a prosecution witness with a prior inconsistent statement, and object to a prosecution witness' "prejudicial testimony during cross examination"; (2) the verdict was against the weight of the evidence; and (3) his conviction on two counts of criminal possession of a weapon was improper because those counts stemmed from the same incident. *See* Dkt. No. 26 at 7-19.

On September 14, 2009, Ruth M. Liebesman, Esq., entered an appearance on behalf of Petitioner. *See* Dkt. No. 27. Counsel moved for an extension of time to file a memorandum of law in support of Petitioner's second amended petition. *See* Dkt. No. 28. On September 15, 2009, the Court granted the motion and gave counsel until November 16, 2009, to file a memorandum of law. *See* Dkt. No. 29. On November 11, 2009, counsel moved for a second extension of time to file a memorandum of law. *See* Dkt. No. 30. On November 12, 2009, the Court granted that request and gave counsel until December 21, 2009, to file a memorandum of law. *See* Text Order dated November 12, 2009. On December 21, 2009, counsel filed a memorandum of law along with several exhibits. *See* Dkt. No. 31. In the memorandum of law, counsel asserted the same arguments that were raised in the *pro se* second amended petition but also argued that trial counsel was ineffective by making an improper comment during summation. *See id.*

The Court directed a response to the second amended petition in a Memorandum-Decision and Order dated December 22, 2009. *See* Dkt. No. 32. Thereafter, on three occasions, the New York State Attorney General's Office, acting on behalf of Respondent, requested an extension of time in which to file a response. *See* Dkt. Nos. 33, 35, 37. The Court granted all

three requests.  *See* Dkt. Nos. 34, 36, 38.  On June 4, 2010, Respondent filed a response to the second amended petition along with a memorandum of law and relevant state-court records.[2]  *See* Dkt. Nos. 40-43.  The Court ordered Petitioner to file any traverse within thirty days.  *See* Dkt. No. 38.

On June 22, 2010, Petitioner's counsel filed a motion for a sixty-day extension of time in which to file a traverse.  *See* Dkt. No. 44.  The Court granted counsel a thirty-day extension.  *See* Text Order dated June 24, 2010.

On July 29, 2010, Petitioner's counsel filed a motion to stay the second amended petition. *See* Dkt. No. 45.  The Court denied the motion without prejudice because it did not comport with Local Rule 7.1(a)(1).  *See* Text Order dated July 30, 2010.  Petitioner's counsel then filed a second motion to stay.  *See* Dkt. No. 46.  On August 13, 2010, Respondent filed a response in opposition to the motion to stay the petition.  *See* Dkt. Nos. 48-49.  On August 23, 2010, this Court denied the motion to stay with prejudice.  *See* Dkt. No. 50.  In the interim, on August 2, 2010, Petitioner's counsel filed a traverse.  *See* Dkt. No. 47.


## II. DISCUSSION

### A.     Exhausted claims

#### *1. Standard of review*

The enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA") brought about significant new limitations on the power of a federal court to grant habeas relief to a state

---

[2] On September 16, 2010, Respondent filed two pages of supplemental state-court records that were "inadvertently" omitted from the previously filed state court records.  *See* Dkt. No. 51.

prisoner under 28 U.S.C. § 2254.  In discussing this deferential standard, the Second Circuit

noted in *Rodriguez v. Miller*, 439 F.3d 68 (2d Cir. 2006), that

> a federal court may award habeas corpus relief with respect to a
> claim adjudicated on the merits in state court only if the
> adjudication resulted in an outcome that: (1) was "contrary to, or
> involved an unreasonable application of, clearly established
> Federal law, as determined by the Supreme Court of the United
> States"; or (2) was "based on an unreasonable determination of the
> facts in light of the evidence presented in the State court
> proceeding."

*Id.* at 73 (quoting 28 U.S.C. § 2254(d)) (footnote omitted);[3] *see also DeBerry v. Portuondo*, 403
F.3d 57, 66 (2d Cir. 2005) (quotation omitted); *Miranda v. Bennett*, 322 F.3d 171, 177-78 (2d
Cir. 2003) (quotation omitted); *Boyette v. LeFevre*, 246 F.3d 76, 88 (2d Cir. 2001) (quotation
omitted).

In providing guidance concerning application of this test, the Second Circuit has observed

that

> a state court's decision is "contrary to" clearly established federal
> law if it contradicts Supreme Court precedent on the application of
> a legal rule, or addresses a set of facts "materially
> indistinguishable" from a Supreme Court decision but nevertheless
> comes to a different conclusion than the Court did.  [*Williams v.
> Taylor*, 529 U.S. 362] at 405-06, 120 S. Ct. 1495 [(2000)]; *Loliscio
> v. Goord*, 263 F.3d 178, 184 (2d Cir. 2001) . . . . [A] state court's
> decision is an "unreasonable application of" clearly established
> federal law if the state court "identifies the correct governing legal
> principle from [the Supreme] Court's decisions but unreasonably
> applies that principle to the facts" of the case before it.  *Williams*,
> 529 U.S. at 413, 120 S. Ct. 1495.

*Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007); *see also Williams v. Artuz*, 237 F.3d
147, 152 (2d Cir. 2001) (citing *Francis S. v. Stone*, 221 F.3d 100, 108-09 (2d Cir. 2000)).

Significantly, a federal court engaged in habeas review is not charged with determining

---

[3] The Court notes that "clearly established federal law" in this context "refers only to the
holdings of the Supreme Court."  *Rodriguez v. Miller*, 537 F.3d 102, 106 (2d Cir. 2008) (citing
*Williams v. Taylor*, 529 U.S. at 412, 120 S. Ct. 1495).

whether the state court's determination was merely incorrect or erroneous, but instead whether

such determination was "objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409

(2000); *see also Sellan v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001) (citation omitted).  Courts

have interpreted "objectively unreasonable" in this context to mean that "'some increment of

incorrectness beyond error'" is required for the habeas court to properly grant the application.

*Earley v. Murray*, 451 F.3d 71, 74 (2d Cir. 2006) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111

(2d Cir. 2000)).


### 2. Review of claim*s - effectiveness of trial counsel*

Petitioner argues that defense counsel, Michael S. Fauci, ("counsel") was ineffective by

failing to (1) present an alibi defense, (2) conduct an adequate pre-trial investigation, (3) object to

prejudicial cross-examination testimony of Matthew Young, and (4) impeach Charles Lewis.  *See*

Dkt. No. 26 at 7-17.  Respondent argues that the state court's rejection of Petitioner's claims of

ineffectiveness of trial counsel was not contrary to, or did not involve an unreasonable

application of, clearly established Supreme Court precedent.  *See* Dkt. No. 41 at 26-48.

In his § 440 motion, Petitioner raised the aforementioned claims.  *See* Dkt. No. 42-9.  The

County Court, Broome County, rejected Petitioner's arguments.  *See* Dkt. No. 42-12.  As the

Court will discuss in more detail, this determination was not contrary to, or did not involve an

unreasonable application of, clearly established Supreme Court law.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal

prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his

defence."  U.S. Const. amend. VI.  To establish a violation of this right to the effective assistance

of counsel, a habeas petitioner must show both (1) that counsel's representation fell below an objective standard of reasonableness, measured in the light of prevailing professional norms; and (2) resulting prejudice, that is, a reasonable probability that, but for counsel's unprofessional performance, the outcome of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 688-90 (1984); *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (noting that "the legal principles that govern claims of ineffective assistance of counsel" were established in *Strickland*.). There is a strong presumption that counsel's conduct fell within the wide range of reasonable assistance and that counsel's actions constituted sound trial strategy under the circumstances. *See Cuevas v. Henderson*, 801 F.2d 586, 589-90 (2d Cir. 1986) (quotation omitted).

### a. Counsel's conduct in general

The record shows that counsel's performance was objectively reasonable. Before trial, counsel filed appropriate pre-trial motions, including an omnibus motion to dismiss the indictment and suppress evidence. *See* Dkt. No. 42-16 at 10-24. During the suppression hearing, counsel vigorously cross-examined witnesses. *See id.* at 72-158. Counsel also made several objections. *See id.* at 121, 123, 138, 139. Counsel also highlighted the fact that Petitioner was sixteen-years old at the time that the police interviewed him and was "chained to a chair" during that time. *See id.* at 150. At the end of the hearing, the trial court denied the motion to suppress with one exception. *See id.* at 153. The court suppressed Petitioner's request for an attorney, which he made to Investigator Surace. *See id.*

During other hearings, counsel requested the prohibition of television cameras because

Petitioner did not want his image on television.  *See* Dkt. No. 42-16 at 51-52, 67.  The trial court granted these requests.  *See id.*

   During trial, counsel argued that the evidence was insufficient.  For instance, during his opening statement, counsel highlighted the lack of eyewitnesses and lack of physical evidence. *See* TT at 208-10.  Counsel also argued that the prosecution would be relying on questionable witnesses.  *See id.*

   In addition, counsel made several objections during the People's case.  *See id.* at 227, 306. Counsel also cross-examined several witnesses at length, including Matthew Young.  *See id.* at 335-59, 362.  Counsel reviewed Young's criminal history, which included a felony.  *See id.* at 336.  Counsel also impeached Young regarding the reason why he drove Petitioner and Puda on the date and time in question.  *See id.* at 343, 351, 353, 355.  Counsel also elicited from this witness that he came forward to the police only after he was charged with a felony and threatened with a conspiracy charge.  *See id.* at 359.

   Counsel also strongly cross-examined Lisa Mack at length.  *See id.* at 382-93.  Counsel elicited testimony from Mack that she used drugs and was involved in the distribution of drugs. *See id.* at 391-92.  Counsel also elicited that Mack received favorable treatment from the police regarding an arrest warrant.  *See id.* at 394-95.

   Furthermore, counsel vigorously cross-examined Investigator Brett Surace.  *See id.* at 425-34.  He elicited from this witness that one of the other officers yelled obscenities at Petitioner.  *See id.* at 426-27.  Counsel also established that Investigator Surace was alone with Petitioner when Petitioner confessed, that no other officers observed or heard Petitioner render such statements, and that the interview with Petitioner was not recorded.  *See id.* at 426-28.  He

also drew out that Petitioner was sixteen-years old at the time of his interview and that during the interview Petitioner stated that he was thinking about his young child.  *See id.* at 425-26.

At the conclusion of the People's case, counsel moved to dismiss the indictment on the ground that the People failed to prove a legally sufficient case.  *See id.* at 222.  He also requested several jury instructions.  *See id.* at 442-46.

Counsel then presented a comprehensive summation.  *See id.* at 448-56.  Counsel pointed out the brevity of the trial and reminded the jury that there were no eyewitnesses and no physical evidence linking Petitioner to the crime.  *See id.* at 448-49.  He also reminded the jury that the prosecution's witnesses were questionable.  *See id.* at 449-50.  He further pointed out that, when the police interviewed Petitioner, Petitioner was a "boy . . . sitting chained to a chair being screamed at by white men" and questioned whether Petitioner's admission was given of his own "free will or was it more a result of his four hours of captivity and his willingness to cooperate simply to get out of this coercive atmosphere."  *See id.* at 450-51.  He also questioned why Investigator Surace failed to record his interview with Petitioner, open the door to the room, or allow another individual to listen.  *See id.* at 451.

Counsel then asked the jury to approach its deliberations with a presumption of innocence.  *See id.* at 455.  He also argued that Petitioner's presence at the scene was insufficient to support a conviction.  *See id.* at 456.

Following summations, the trial court granted counsel's motion to dismiss count two of the indictment (murder by depraved indifference).  *See id.* at 501.


### *b. Alleged failures to investigate and present an alibi defense*

Petitioner argues that counsel was ineffective because he failed to investigate and present an alibi defense. *See* Dkt. No. 26 at 7-11; Dkt. No. 31 at 17-33; Dkt. No. 47 at 4-8. Petitioner claims that the following individuals would have testified that he was at his mother's house in Brooklyn on the night of the murder: Vanity Smith (his daughter's mother), Harriet Wright (his mother), Jahkeesha Wright (his sister), and three friends. *See id.* For support, Petitioner submitted affidavits from his family members and one friend. *See id.* Dkt. Nos. 31-1 through 31-4.

Respondent argues that Petitioner failed to establish that counsel's decision to refrain from calling an alibi witness was evidence that counsel's representation fell below an objective standard of reasonableness. *See* Dkt. No. 41 at 36-39. Respondent points out that there is nothing in the record to demonstrate that counsel's decision to refrain from calling any alibi witnesses was anything other than sound trial strategy. *See id.* Respondent also argues that Petitioner fails to allege specifically how the alibi testimony of his mother, sister, and child's mother would have exonerated him "in light of the fact that they were interested witnesses whose purported testimony directly contradicted the testimony of multiple eyewitnesses who placed [P]etitioner at the crime scene." *See* Dkt. No. 41 at 38-39 (citations omitted).

In his § 440 motion, Petitioner set forth a similar claim. The County Court rejected Petitioner's argument. The Court provided the following detailed analysis:

> As for counsel's alleged failure to investigate and/or pursue an alibi defense, defendant has submitted affidavits from three people he would have offered as alibi witnesses. Each describe an ordinary domestic scene, devoid of any reference as to how the witness recalled the evening in question, almost a month earlier than the defendant's arrest, which, obviously, would have been the very first time any of them would have been called upon to try to

-12-

remember seeing the defendant on March 28, 2008.

Included with these affidavits are two letters from counsel to the defendant responding to defendant's letters (not included with the motion). Counsel states in his letter of October 17, 2007 that after discussion with the defendant regarding alibi witnesses "it was [Petitioner's] decision to not have them testify on [his] behalf." His letter of October 29, 2007 indicates the "only person who would verify [his] whereabouts was [his] mother," but that this statement came only one or two days before trial. This latter point is at odds with her affidavit of March 22, 2008, in which she states she gave the attorney the alibi information on numerous occasions from May 2003 up to the trial. Defendant contends in his affidavit that he advised counsel at their earliest meetings of his alibi witnesses, and continued to press the matter during later meetings. Defendant's affidavit further alleges that counsel was 'evasive,' when questioned about the status of the investigation into the alibi information. Although the tenor of defendant's affidavit is at odds with counsel's responses in the letters submitted with the instant motion, a reading of defendant's affidavit and those letters establishes that there had been earlier discussions regarding the potential of an alibi defense. Counsel's letters, read together, establish that the only potential alibi witness was defendant's mother. As the district attorney argues, given the other evidence in the case, it is unlikely her testimony alone would have persuaded the jury to find the defendant not present or involved in the shooting.

In reaching this determination, the Court must necessarily look at the record evidence [such as] [t]he defendant's own confession, which had been admitted at trial following a *Huntley* hearing; [and] the testimony of two witnesses who place the defendant in Binghamton on the night of the murder. While those witnesses testified pursuant to agreements with the district attorney, those agreements were before the jury for consideration, and, as noted above, counsel did in fact effectively, if not perfectly, cross-examine those witnesses.

. . . [Petitioner's] own submissions establish counsel's strategic and legitimate reasons for forgoing the alibi defense. Counsel's strategy was to focus on the lack of physical evidence, the unreliability of the 'confession' by this sixteen[-]year old defendant, and the unreliability of the people's unsavory witnesses.

-13-

> That his strategy failed does not yield the conclusion that his
> representation was ineffective.

*See* Dkt. No. 42-12 at 4-5.

This determination was not contrary to, or did not involve an unreasonable application of,

clearly established Supreme Court law.

"The decision whether to call any witnesses on behalf of the defendant, and if so which

witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every

trial." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987).  The decision to refrain

from calling a specific witness, even one who may offer exculpatory evidence, is ordinarily not

viewed as a lapse in professional representation.  *See Greiner v. Wells*, 417 F.3d 305, 323 (2d

Cir. 2005) (quotation and other citations omitted).

First, Petitioner argues that counsel failed to investigate an alibi defense.  *See* Dkt. No. 26

at 7-11, Dkt. No. 31 at 27, 30-33.  However, the affidavits from Petitioner's family members

plainly indicate that prior to trial, counsel spoke to each family member at least once about

Petitioner's whereabouts on the date in question.  For instance, Vanity Smith provided details of

her conversation with counsel.  *See* Dkt. No. 31-1 at 2.  Similarly, Harriet Wright stated that she

spoke to counsel *on numerous occasions* about the possibility of her testifying on Petitioner's

behalf.  *See* Dkt. No. 31-2 at 2.  Further, Jahkeesha Wright stated that she discussed the

possibility of her testifying on Petitioner's behalf with counsel.  *See* Dkt. No. 31-3 at 3.

Therefore, the Court concludes that counsel investigated the alibi defense.[4]

_____

[4] To the extent that Petitioner argues that counsel should have investigated his alibi
defense by interviewing his friends, this argument is unavailing.  Regarding two of the friends

(continued...)

-14-

Second, Petitioner argues that counsel provided ineffective assistance by failing to present an alibi defense. *See* Dkt. No. 26 at 7-11; Dkt. No. 31 at 17-33; Dkt. No. 47 at 4-8. Even assuming that counsel made the decision to refrain from presenting an alibi defense, as Petitioner argues,[5] this decision was strategic. Counsel pursued a strong alternative theory by focusing on the lack of physical evidence, the suspiciousness of Petitioner's "confession," and the unsavoriness of the prosecution's witnesses. In fact, counsel stated in a letter to Petitioner that he found the jury's verdict "incredulous." *See* Dkt. No. 42-9 at 48. Simply because this strategy failed, does not indicate that counsel's representation was ineffective.[6]

_____

[4](...continued)
(Esley Porteous and Shana Diggs), no affidavits from these individuals are in the record. Instead, Petitioner's counsel simply speculates as to what these individuals "would" have testified. However, unsubstantiated conclusions, opinions, or speculation cannot serve as a basis for habeas relief. *See Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (asserting that federal courts should not grant "habeas relief on the basis of little more than speculation with slight support"). Regarding the third friend (Champ Richardson), an affidavit was submitted to this Court. In the affidavit, Richardson states that he observed Petitioner with various family members at Petitioner's home in Brooklyn on the night of the incident. *See* Dkt. No. 31-4. However, the Court notes that Petitioner did not submit this affidavit to the County Court with his § 440 motion. Therefore, whether this Court may properly review this affidavit is questionable. Moreover, the affidavit fails to specify *when* Richardson called counsel and does not specifically negate the possibility that Richardson spoke with counsel on the phone. *See* Dkt. No. 31-4. In any event, Richardson stated that, when he left messages for counsel, he stated that he could serve as an alibi witness because he saw Petitioner the night of the murder. *See id.* Therefore, counsel was provided with information regarding Richardson's willingness to testify as an alibi witness but refrained from calling Richardson as an alibi witness. Perhaps counsel determined that Richardson's testimony would have distracted the jury by raising questions as to why none of Petitioner's family members testified and the fact that Richardson was an interested witness.

[5] The letters to Petitioner from counsel indicate the opposite, namely that Petitioner decided not to have the family members testify on his behalf and that Petitioner told counsel "not to press the issue." *See* Dkt. No. 42-9 at 47-49.

[6] Moreover, counsel's letters to Petitioner indicate that counsel attempted to present an
(continued...)

Moreover, Petitioner offers nothing to indicate that these individuals would have been strong witnesses nor does he offer any proof corroborating these individual's versions of the events on the date in question.  "[U]nless alibi witnesses are strong and corroborative proofs support their assertions, experienced defense counsel may eschew potentials of alibi proofs for fear that juries may assess relative credibility rather than reasonable doubt." *Perkins v. Comm'r of Corr. Servs.*, No. 04-CV-2307, 2005 WL 3591722, *5 (E.D.N.Y. Dec. 30, 2005) (citation omitted), *aff'd* 218 Fed. Appx. 24 (2d Cir. 2007).  Thus, counsel may have reasonably harbored doubts about their credibility.  Indeed, according to Petitioner, counsel stated that he "knew that [P]etitioner's family and friends would go to any extent to lie for him . . . and . . . [they] . . . would not be credible." *See* Dkt. No. 26 at ¶ 28.  Thus, counsel's decision to refrain from presenting an alibi defense was a tactical decision.  *See Samuels v. Bennett*, No. 03 Civ. 2340, 2009 WL 2516850, *23 (S.D.N.Y. Aug. 17, 2009) (adopting report-recommendation of U.S. Magistrate Judge Maas in which he recommended that the court deny a claim alleging ineffective assistance of counsel where defense counsel failed to call alibi witnesses who were related to the defendant because their "familial relationship" with the defendant "would detract from their testimony and actually hurt [the defendant's] overall defense").

Further, given the evidence that the prosecution presented, particularly the confession that Detective Surace obtained and the testimony of two witnesses who placed Petitioner in Binghamton the night of the murder, Petitioner cannot demonstrate that there is a reasonable

---

[6](...continued)
alibi defense, but the only available witness to testify to Petitioner's whereabouts was Petitioner's mother and her statement "came one or two days prior to trial," which was after the deadline for filing a notice of alibi. *See* Dkt. No. 42-9 at 47-49.  Counsel approached the trial court with this information, but the trial court judge would not permit counsel to file a late notice of alibi. *See id.*

possibility that the jury would have acquitted him had his family members and friends testified.

In sum, Petitioner has failed to meet either prong of the *Strickland* standard.

Accordingly, the Court finds that Petitioner is not entitled to habeas relief based upon this

ground.  Moreover, to the extent that Petitioner requests an evidentiary hearing on this issue, *see*

Dkt. No. 31 at 22-24, the Court denies this request as moot.[7]


### c. Alleged failure to investigate potential exculpatory evidence

Petitioner argues that counsel was ineffective for failing to investigate potential

exculpatory evidence.  *See* Dkt. No. 26 at 11-13; Dkt. No. 31 at 19-21, 26-30; Dkt. No. 47 at 8-

10.  Specifically, Petitioner argues that counsel failed to interview or call as witnesses the

following individuals who provided statements to the police regarding the night of the murder:[8]

> (1) Brian T. Brohel heard five or six rapid gunshots and then saw a
> black male, wearing a light grey hooded sweatshirt, running from
> the Vinny Mart and pulling up his hood.  *See* Dkt. No. 31-5.
>
> (2) Joshua Lasky heard five or six gunshots and then saw a black
> male, wearing a light grey "hoody" and running from the Vinny
> Mart.  *See* Dkt. No. 31-6.
>
> (3) Charles J. Lewis was inside the Vinny Mart when he heard
> multiple gunshots and saw a black male in front of the store.  The
> male was about 6 feet tall, wearing black clothes and a white
> bandana with black dots.  *See* Dkt. No. 31-7.

---

[7] The County Court also properly denied this request.  *See* Dkt. No. 42-12 at 5.  The court noted that a hearing was unnecessary; that Petitioner had failed to establish a need for such a hearing; and that Petitioner's own submissions established counsel's "strategic and legitimate reasons for forgoing the alibi defense."  *See id.*

[8] Petitioner also appears to argue that counsel failed to cross-examine these individuals at trial properly.  *See* Dkt. No. 26 at 13.  However, the only individual in this group who testified at trial was Charles Lewis.  The Court will address this argument later.

(4) Danielle J. Igo was across the street from the Vinny Mart and heard gun shots. She saw a "dark colored SUV" parked at an angle near the rear of the store and a "shorter black male running from the area of the SUV." The man was wearing "dark clothing" with "something over his head," which prevented Igo from seeing his face. *See* Dkt. Nos. 31-8, 51-1 at 3.

(5) Mark Sloan was near the Vinny Mart on the night of the shooting when he witnessed an argument between the victim and a black male in his early twenties, who was approximately 5'10" tall and weighed between 180 and 190 pounds. He stated that he saw the victim shoot the male with whom he was arguing. Sloan then started to walk away when he heard more shots, which he thought "came from another gun because they were louder th[a]n the first shots." *See* Dkt. No. 31-9.

Respondent argues that this claim is meritless because Petitioner fails to allege what further investigation of this case would have revealed. *See* Dkt. No. 41 at 42. Respondent also contends that Petitioner's bald assertions are essentially complaints about trial strategy and fail to show that counsel acted unreasonably. *See id.* at 42-43.

In his § 440 motion, Petitioner set forth a similar argument. *See* Dkt. No. 42-9 at 10-11. The County Court rejected his argument. *See* Dkt. No. 42-12. The court noted that counsel's strategy was to focus on the lack of physical evidence, the unreliability of the "confession" of Petitioner, who was sixteen-years old at the time, and the unreliability of the People's unsavory witnesses. *See Id.* at 5. This determination was not contrary to, or did not involve an unreasonable application of, clearly established Supreme Court law.

A criminal defendant's right to effective assistance of counsel includes the right to an attorney who makes "reasonable investigations" or "a reasonable decision that makes particular investigations unnecessary." *Greiner v. Wells*, 417 F.3d 305, 320-21 (2d Cir. 2005) (quoting

-18-

*Strickland*, 466 U.S. at 691, 104 S. Ct. 2052) (other citations omitted).  However, defense

counsel are not compelled "to investigate comprehensively every lead or possible defense."  *Id.*

(citing *Strickland*, 466 U.S. at 699, 104 S. Ct. 2052; *United States v. Cruz*, 785 F.2d 399, 406 (2d

Cir. 1986)).  "When there is 'reason to believe that pursuing certain investigations would be

fruitless or even harmful, counsel's failure to pursue those investigations may not later be

challenged as unreasonable.'"  *Id.* (quoting *Strickland*, 466 U.S. at 691, 104 S. Ct. 2052) (other

citation omitted).  Moreover, "'strategic choices made after thorough investigation of law and

facts relevant to plausible options are virtually unchallengeable,' . . . and even strategic choices

made after less than complete investigation do not amount to ineffective assistance – so long as

the known facts made it reasonable to believe that further investigation was unnecessary. . . ."

*Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (quotation omitted).

 Petitioner argues that counsel should have investigated these "various accounts" because

there was a "reasonable possibility that counsel would have either uncovered evidence that would

have strengthened his case or would have been [used] to impeach prosecution witnesses."  *See*

Dkt. No. 26 at 13.  However, Petitioner simply speculates that an investigation would have been

fruitful.  Unsubstantiated conclusions, opinions, or speculation cannot serve as a basis for habeas

relief.  *See Wood*, 516 U.S. at 8.  Additionally, the Court notes that none of the individuals stated

that they observed who shot the victim.  Thus, it was objectively reasonable for counsel to refrain

from investigating these "various accounts."

 Petitioner also argues that Sloan's statement "completely contradicted" the People's case

because Sloan's version of events placed the victim as the instigator of the shoot-out and not the

victim of a mistaken identity and because Sloan's description of the shooter was "completely at

-19-

odds" with the appearance of Petitioner at the time of the incident.  *See id.* at 28.  Petitioner

claims that, at the time of the incident, he was 6'3" in height and weighed 230 pounds.  *See* Dkt.

No. 31 at 28.  Petitioner claims that counsel had an obligation to seek out Sloan, interview him,

and call him as a witness at trial.  *See id.* at 28-29.  He argues that, if counsel was unable to find

Sloan, he "could have sought to introduce his sworn statement into evidence" under an exception

to the hearsay rule.  *See id.*

Petitioner fails to suggest how calling Sloan as a witness would have been helpful to his

defense.  There were obvious concerns with this witness's character.  Sloan stated that he went to

the Vinny Mart with his friend to buy beer and "$40.00 worth of crack cocaine for us to smoke."

*See* Dkt. No. 31-9 at 2.  Sloan also stated that he was with his friend on previous occasions when

his friend called someone to deliver crack cocaine.  *See id.*

In addition, contrary to Petitioner's argument, Sloan did *not* identify the shooter because

*Sloan never stated that he saw who shot the victim*.  Instead, Sloan simply stated that he saw a

black male, who was in his early twenties and was approximately 5'10" in height and weighed

between 180 and 190 pounds, arguing with the victim.  After hearing a "short argument," he

thought that he heard a gunshot.  He turned and saw that the victim was shooting the black male

with whom he argued.  Sloan then started walking away and heard more shots.  *See* Dkt. No. 31-

9 at 2.  Thus, Sloan never stated that he saw who shot the victim.

In light of Sloan's questionable character and the fact that Sloan did not observe who shot

the victim, it was objectively reasonable for counsel to refrain from interviewing Sloan and/or

calling him as a witness.  In addition, Petitioner has failed to established that the outcome of the

trial would have been different had counsel interviewed the individuals in question and/or called

them as witnesses during trial.  Accordingly, the Court finds that Petitioner is not entitled to

habeas relief based upon this ground.

To the extent that Petitioner claims that counsel should have sought to enter Sloan's

statement into evidence as an exception to the hearsay rule if Sloan was unavailable to testify at

trial, *see* Dkt. No. 31 at 28, Petitioner did not raise this claim on direct appeal or in his § 440

motion.  Thus, the claim is deemed exhausted but procedurally defaulted.[9]


### d. Alleged failure to object during Young's cross-examination testimony

Petitioner argues that counsel rendered ineffective assistance of counsel when he failed to

object during Young's testimony on cross-examination, which Petitioner claims was "non-

responsive, misleading, and severely prejudicial" and was "loaded with hearsay and

impermissible bolstering."  *See* Dkt. No. 26 at 13-14.

Petitioner points to the following portion of counsel's cross-examination of Young:

| Counsel: | Did [the police] talk to you about what you might be charged with?  Perhaps conspiracy to murder? |
|---|---|
| Young: | Yes, they told me that.  I was - - they told me I could be very, very, very - - cause they w[ere] aware of everything [sic].  They w[ere] aware that - - that they knew I drove the car over to Doubleday Street that night.  They knew that I did - - that the reefer and stuff I brought back wasn't mine.  They knew everything.  And they told me they said, you don't have to - - they say you don't have to say nothing [sic].  You got your right to your lawyer.  You don't have to say nothing [sic].  But you shouldn't have to - - excuse me - - |

---

[9] In any event, Petitioner does nothing more than speculate that, *if* Sloan was unavailable, counsel should have attempted to introduce his statement.  Unsubstantiated conclusions, opinions, or speculation cannot serve as a basis for habeas relief.  *See Wood*, 516 U.S. at 8.  Thus, even if the Court did not deem this claim exhausted but procedurally defaulted, the Court would deny this claim as speculative.

> you shouldn't have to - - you shouldn't have to go to no jail for
> something that you not even involved with [sic].  Somebody that
> you don't know.  They know everything.

*See* TT at 341-42.

Petitioner also points out that, when counsel asked Young to "recall the part where [his]

conscience got the best of [him when he] decided to tell the police [the rest of his version of the

events]," Young eventually responded, "That part, like I said, I never seen nothing like that

happen before [sic].  I never - - I never - - well, I didn't see, but I never, you know, been with

nobody that ever murdered anybody before [sic]."  *See id.* at 343.

Petitioner further points out that shortly after Young testified that he knew that Petitioner

and Puda were going to hurt somebody, Young stated the following:

> And I didn't - - I had no idea it was going to follow through.
> You're talking two weeks later whatever like that when it
> happened.  I didn't have no idea they was going to follow through
> with this junk [sic].  I begged them not to do nothing like that [sic].
> I begged them.  And they can't say I didn't.  Because if they had
> listened to [an] old fool like me they wouldn't be sitting there, we
> would all be at home relaxing enjoying ourselves.  We all - - if
> they're listen to an old fool like me [sic] - - I ain't really old, but I'm
> 50 years old - - we all would have been home.  Everybody would
> have been happy.  Nobody would be having no sad face [sic].  And
> playing with the kids and all of that.  All they had to do was take it
> and don't do it.  I mean you don't foul up nothing to do things like
> that.  You took it upon yourselves and you fouled this thing up.
> You constantly fouled it up like - - like like it's a joke or
> something.  I mean somebody tried to - - you don't do this, man.
> Don't do it.  I ain't nobody going - - I ain't - - [sic] it's not my job
> for me to come to the police and say, well, officer, I think you
> better go and watch this lady over here because sooner or later this
> lady going to do something.  It's not my job to do that.

*See id.* at 353-54.

Respondent argues that counsel committed no error in this regard.  *See* Dkt. No. 41 at 43-

44.  Respondent also contends that counsel thoroughly and effectively cross-examined Young.

*See id.*

In his § 440 motion, Petitioner raised the same argument.  *See* Dkt. No. 42-9 at 11-13.  In rejecting this argument, the County Court stated the following:

> The defendant points to certain aspects of counsel's trial cross-examination, questioning the manner in which it was conducted and counsel's failure to object to certain aspects of the witness's responses.  In isolation, one possibly could question counsel's actions.  However, looking at the entirety of the cross-examination, the record supports the conclusion that counsel conducted a thorough and effective cross-examination of the witnesses. Although counsel could have objected to Matthew Young's rambling and non-responsive answers, that he did not does not yield the conclusion that he should or must have done so.  A legitimate strategy with such a witness is to let him ramble, thus exposing his inconsistencies, hostility, etc.  A reading of his entire testimony warrants the fair conclusion that counsel's strategy was to do just that.

*See* Dkt. No. 42-12 at 3-4.

This determination was not contrary to, or did not involve an unreasonable application of, clearly established Supreme Court law.

"Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature" and generally will not support an ineffective assistance claim. *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987) (citation omitted).

Counsel's overall performance during cross-examination of Young was objectively reasonable.  For instance, counsel thoroughly reviewed Young's criminal history and discussed at length why Young changed the "story" that he gave to the police.  *See* TT at 336-38, 342-51. Counsel also raised questions as to Young's ability to remember, *see id.* at 350, and impeached

-23-

Young when he testified that "he had no idea what was going to happen at the [convenience store] other than buying some marijuana," which contradicted his earlier testimony that he drove Petitioner and Puda "to hurt" Ratike because Ratike was "disrespect[ful]." *See id.* at 343, 351, 353, 355.  Counsel also elicited from this witness that he came forward to the police only after he was charged with a felony and threatened with a conspiracy charge.  *See id.* at 359.

Counsel also showed control of the witness.  For instance, counsel stopped Young from providing a non-responsive answer and from answering a certain question at length.  *See id.* at 339, 345.  Although it is true that counsel made no objection to the specific testimony in question, it appears that counsel's strategy was to allow Young to ramble, which is a legitimate strategy.  Perhaps counsel determined that allowing Young to ramble would allow Young to expose more inconsistencies, more testimony regarding drugs, or any hostilities.

Therefore, the Court concludes that Petitioner has failed to establish that counsel's representation fell below an objective standard of reasonableness and a reasonable probability that the outcome of the trial would have been different had counsel objected to the testimony in question.  Accordingly, the Court finds that Petitioner is not entitled to habeas relief based upon this ground.

### e. Alleged failure to impeach Charles Lewis

Petitioner argues that counsel rendered ineffective assistance of counsel for failing to impeach Lewis.  *See* Dkt. No. 26 at 16-17.  Petitioner claims that Lewis witnessed the shooting and that Lewis' trial testimony that "the person who shot [the victim] wore all black and had on a black bandanna with white dots on it" was inconsistent with his prior statement to the police that

the shooter wore a white bandanna with black dots on it.  *See id.* at 16.  Petitioner also claims

that the "only evidence that linked the bandana that was found in [his] apartment to the bandana

that the shooter had on was the testimony of Lewis."  *See id.*

Respondent argues that the record does not support this claim because Lewis did not

witness the shooting.  *See* Dkt. No. 41 at 44-45.  Respondent also points out that at trial Lewis

simply stated that he saw a black male with a gun in front of the store.  *See id.*

In his § 440 motion, Petitioner raised the same argument.  *See* Dkt. No. 42-9 at 10.  In

rejecting this argument, the County Court found that the record supported the conclusion that

"counsel conducted a thorough and effective cross-examination of the witnesses."  *See* Dkt. No.

42-12 at 4.  This determination was not contrary to, or did not involve an unreasonable

application of, clearly established Supreme Court law.

"[S]trategic choices made after [a] thorough investigation of law and facts relevant to

plausible options are virtually unchallengeable. . . ."  *Strickland*, 466 U.S. at 690.  Moreover,

"counsel is strongly presumed to have rendered adequate assistance and made all significant

decisions in the exercise of reasonable professional judgment."  *Id.*

In his statement to the police, Lewis stated that he was inside the Vinny Mart when he

heard multiple gunshots and saw a black male in front of the store.  *See* Dkt. No. 31-7.  The male

was about six-feet tall, wearing black clothes and a *white bandana with black dots*.  *See id.*

However, at trial, Lewis stated that the male was wearing a *black bandana with white dots*.  *See*

Dkt. No. 51-1 at 1.

Counsel made a strategic decision to refrain from attempting to impeach Lewis as to the

discrepancy in Lewis' description of the bandanas.  During trial, Lewis initially was somewhat

-25-

unclear when recalling the appearance of the bandana.  He stated that the male "had a black

bandana with white like dots on it or something, whatever, little, little - - [sic]"  *See* Dkt. No. 51-

1 at 1.  The trial court then asked, "Little what?"  *See id.*  Lewis replied, "White dots on it."  *See*

*id.*  Perhaps counsel determined that highlighting this minor discrepancy would have caused the

jury to give significant weight to the rest of Lewis' testimony, particularly because his description

at trial was otherwise consistent with the description he provided in his statement to the police.

During both instances, he stated that he saw a black male, wearing all black clothing.  *See* Dkt.

No. 31-7, Dkt. No. 51-1 at 1.  Perhaps counsel also determined that, if he attempted to impeach

Lewis, Lewis would have been given an opportunity to clarify his description of the bandana.

        To the extent that Petitioner claims that Lewis' testimony was the "only evidence that

linked the bandana that was found in [his] apartment to the bandana that the shooter had on," *see*

Dkt. No. 26 at 16, none of the witnesses stated that they saw who shot the victim.  Therefore, the

Court sees no such link.

        Thus, it was objectively reasonable for counsel to refrain from impeaching Lewis.

Moreover, Petitioner has failed to establish a reasonable probability that the outcome of the trial

would have been different had counsel attempted to impeach Lewis.  Accordingly, the Court

finds that Petitioner is not entitled to habeas relief based upon this ground.


**B.      Unexhausted claims**

        Respondent argues that Petitioner failed to exhaust certain claims but that the Court

should deem those claims exhausted and procedurally barred.  *See* Dkt. No. 40 at ¶ 4; Dkt. No.

41 at 18-24.  Respondent refers to the following claims: (1) defense counsel was ineffective by

making an improper comment during his summation; (2) the verdict was against the weight of the evidence; and (3) Petitioner's convictions for second-degree and third-degree criminal possession of a weapon were improper.  *See id.*

Regarding the first claim, Petitioner states that he was not required to exhaust that claim because it is not "a ground for contending ineffective assistance of counsel."[10]  *See* Dkt. No. 47 at 2.  In any event, Petitioner did not fairly present this first claim to the state courts.  He neither raised this claim on direct appeal or in his § 440 motion.  *See* Dkt. Nos. 42-1, 42-9.

Regarding the second and third claims, Petitioner does not discuss whether these claims are exhausted in the traverse.  *See* Dkt. No. 47.  In any event, as Respondent argues, Petitioner's counsel asserted similar arguments on direct appeal, but the claims were not presented in federal constitutional terms.  *See* Dkt. No. 42-1.

There is no longer a state court in which Petitioner can raise these arguments.  He cannot present the arguments to the Court of Appeals in the future because he is entitled to only one leave application.  Moreover, raising these arguments in a § 440 motion would be futile because Petitioner failed to raise these arguments on direct appeal.  Section § 440.10(2)(c) of the New York Criminal Procedure Law bars collateral proceedings when a criminal defendant has failed to raise the grounds on direct appeal.  Thus, since no remaining avenue exists in which Petitioner could raise these claims, they should be deemed exhausted but procedurally defaulted.  *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991) (citations omitted); *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) (citation omitted); *Spence v. Superintendent, Great Meadow Corr. Fac.*,

---

[10] Petitioner explains that he used the statement regarding the summation remark "to demonstrate the totality of the circumstances of the case demonstrated that trial counsel had been ineffective."  *See* Dkt. No. 47 at 2.

219 F.3d 162, 170 (2d Cir. 2000) (citation omitted).

In light of the foregoing, this Court may review these claims only if Petitioner demonstrates cause for the default and resulting prejudice or that the failure of the federal court to review the claim will result in a "fundamental miscarriage of justice," *i.e.*, that he is innocent. *Calderon v. Thompson*, 523 U.S. 538, 559 (1998); *Coleman*, 501 U.S. at 748-750 (quotation and other citation omitted).  To establish "cause" sufficient to excuse a procedural default, a petitioner must show that some objective external factor impeded his ability to comply with the relevant procedural rule.  *See Coleman*, 501 U.S. at 753 (quotation omitted); *Restrepo v. Kelly*, 178 F.3d 634, 638-39 (2d Cir. 1999).  When a petitioner has failed to establish adequate cause for his procedural default, the court need not determine whether he suffered prejudice, since federal habeas relief is generally unavailable as to procedurally defaulted claims unless both cause and prejudice are demonstrated.  *See Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985).

Petitioner fails to show that some objective external factor impeded his ability to comply with the relevant procedural rule.  Thus, Petitioner has not established cause for the default. Petitioner also fails to show that a fundamental miscarriage of justice will result from no federal review of these claims.  Accordingly, the Court denies, as procedurally defaulted, Petitioner's claims that (1) defense counsel was ineffective by making an improper comment during his summation; (2) the verdict was against the weight of the evidence; and (3) Petitioner's convictions for second-degree and third-degree criminal possession of a weapon were improper.

**C.     Certificate of Appealability**

The Court notes that 28 U.S.C. § 2253(c)(1) provides in relevant part that, "[u]nless a

circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the

court of appeals from – (A) the final order in a habeas corpus proceeding in which the detention

complained of arises out of process issued by a State court . . . ."[11]  28 U.S.C. § 2253(c)(1).

A court may only issue a Certificate of Appealability "if the applicant has made a

substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Since

Petitioner has failed to make such a showing, the Court declines to issue a Certificate of

Appealability in this matter.


### III. CONCLUSION

After reviewing the state-court record, the parties' submissions, and the applicable law,

and for the above-stated reasons, the Court hereby

**ORDERS** that Petitioner's second amended habeas petition is **DENIED** and

**DISMISSED**; and the Court further

**ORDERS** that Petitioner's request for a hearing, as set forth in his second amended

habeas petition, is **DENIED AS MOOT**; and the Court further

---

[11] Rule 22 of the Federal Rules of Appellate Procedure also provides that an appeal may not proceed "unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)."  Fed. R. App. P. 22(b).

**ORDERS** that the Clerk of Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules; and the Court further

**ORDERS** that a Certificate of Appealability shall not be issued in this case.

**IT IS SO ORDERED.**

Dated: September 21, 2010
        Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Court Judge

-30-